I do appreciate it also. My name is Joe Howard and I'm here representing appellant Michael Reis. Mr. Reis challenges the sufficiency of the evidence in the resulting in death element in 1503 under Burge. Also the denial of acceptance of responsibility and application of the altogether the substantive reasonableness of the concurrent life sentences that were imposed on both of these cases which were sentenced in one sentencing hearing. Regarding the two cases that were combined here, Your Honors, my client took to trial a conspiracy to distribute a fentanyl resulting in death. In that case, we are respectfully arguing that the government failed to prove in the light most favorable to the verdict that there wasn't reasonable doubt that there is a causal connection between the drugs that were distributed by the defendant and the death of an infant. In this particular case, it was established that my client was a drug dealer and that he had come over to a house of a drug user. What was the time frame between the time established that he had gone to that particular home and the call to 911? I believe it was, forgive me, but I believe it was the same day. I believe it was within a number of hours if I'm not mistaken. In this case, the deceased was a five-year-old and the mother, the drug user, did not testify at trial. However, the statements that she provided to law enforcement who were doing the investigation, they came into evidence. That evidence consisted of the fact that she had done a half of a pill with the defendant and that she had placed the other unused half into a small container, a cup, which she had then placed on her bedside table. The argument that we made was that the causal connection under Burge wasn't established in that we don't know what exactly that child took. The child vomited. The vomit wasn't collected or analyzed. There was a toxicity screening done on the deceased. He was positive for a metabolized version of fentanyl. A cap, like a bottle cap, was found on the bed, the mother's bed, next to the table. That was analyzed and tested positive for fentanyl. However, there was also a container, which matched the description of what the mother described putting the pill in, was also found, where the mother said it would be found. It contained a residue, some type of white powder. That was never analyzed. Did it have a half a pill? No. No. Your Honor, the half a pill was never found. Interestingly, in review of the photographs that were entered into evidence, you will see that there were a number of pill bottles that were sporadically placed around the mother's bedroom. The argument by the government was that these containers were unaccessible to the deceased child. However, in review of the photographs, I would ask you to find that arguably they were accessible. These containers were in drawers. They were on top of dressers. Some contained pills. Some did not. Further, Judge, you will see in the kitchen, there were containers of, there was a container which contained a CBD. It was empty. The point of which is the house was in somewhat of a disarray. We can't explain why, but the assumption we made was because the mother was on drugs and that there were a number of things available to the child throughout the house. The argument is yes, there was my client who brought over a pill. The contents of that pill were never established. We don't know what was in that pill. The government argues that that pill was a fake Percocet, but there's no way of knowing that without finding that pill. We don't know what that child took because there were a number of containers throughout the house, throughout the apartment. A reasonable jury in looking at this would have, should have found that the resulting in death enhancement was not established. You mean your position is it's not proved that the child took fentanyl or that, is that the point? No, we clearly know he took fentanyl. All right, so your point is it's not proved that the defendant delivered fentanyl or just that the fentanyl he delivered was taken by the child. Is it the last one? Yeah, there's multiple steps to this, right? So we don't know, we don't know what he delivered, right? I don't know. Didn't he admit he did? Yes, but he didn't admit to fentanyl, right? So he admitted that he dropped, he went over there and did a pill. Okay, we don't know what was in that pill, but we did establish at trial that fentanyl is a very horrible . . . Counsel, I thought he admitted that he took over a Percocet that had fentanyl in it. Yes or no, did he admit that? Forgive me, Your Honor, but I believe that he only admitted to taking over a pill that was labeled as a Perc 30 and it was the government's witness that established that through his experience . . . Okay. . . . that it's commonly known that those Perc 30s are fake drugs that contain fentanyl. Thank you. Yes, sir. All right. Well, why isn't that enough then for a jury to connect the dots and say the man delivered fentanyl in that Perc 30? Right, because fentanyl is so toxic that even a small amount of fentanyl on a five-year-old can be lethal. And in the event that this drug user, mother, had fentanyl previously in a container and that fentanyl had decomposed or broken down or there were trace amounts of that fentanyl in a container, and if the child had put his fingers in the container or had somehow come in contact with residue fentanyl from a previous usage . . . He delivered is what caused the death, but I thought you were on the point that . . . Well, Hunt was begging him to get over there with the pill, get over with the fentanyl, right? We have . . . that was established at trial. She was begging him to come over. Well, that's debatable, honestly. That sounds like she didn't have the fentanyl is what I'm trying to get your time short. Right. My client was saying that she was begging him for the fentanyl. Yeah. But the government's going to argue that the text messages don't support that. But we don't know what was in telephone conversations, necessarily. So that's the argument, the primary argument on that first case. On the second case, what we're respectfully arguing is that this man pled out to sex trafficking of a minor. And there's two major arguments there. One is that he should have been given acceptance of responsibility, the two points. Did you agree to a joint sentencing? We did. And, you know, in hindsight, maybe that was an error. But I don't think that should . . . I don't think that should keep him from receiving the two-point acceptance of responsibility. He earned that. Did the district court make an alternative finding on acceptance? There seemed to be some suggestion that there was some question about whether acceptance of responsibility was appropriate for the sex trafficking case. And I wasn't sure if there was an alternative finding or not. I don't recall an alternative finding. I may be wrong on that. However, the government argues that he didn't come out of his cell for one of the hearings, for a change of plea hearing. And then the government argues that he didn't come out a second time. Sorry, he had to be dragged out the second time. But the second time he had to be dragged out was because it was their policy that if you don't come out on your own accord the first time, they're going to, quote, drag you out on the second. So I think there was some argument that he wasn't truly taking responsibility. And, you know, he made some statements in the PSI interview, which would suggest that he was minimizing his involvement. However, he's not a very sophisticated man intellectually. And I think that his comments could have been misconstrued. The point of which is he did take responsibility. And the district court didn't address the factors that you say the government was raising in opposition to acceptance? I don't believe so, Judge. Although, we'd have to check the record. I don't want to misrepresent, Judge. I, unfortunately, am out of time. What more did you want to talk about? Well, I wanted to make an argument about the vulnerable victim enhancement. Go ahead, succinctly. Succinctly. The enhancement was applied without sufficient findings that the victim's vulnerability beyond age was already captured in the sentencing guideline 2G1.3. Or that she was exploited in a manner warranting an additional two levels. Well, does it come down to whether the judge relied on more than age? Correct, it does. It does. There's an argument that the victim was vulnerable for reasons other than age. Correct. There were arguments other than age, but... What's wrong with that? Well, the 2G1.3 takes into consideration that there has to be something more than just taking advantage of a child. If she was a runaway and homeless? True, 100 percent. Yeah. Okay. That would be more than age, I guess, is the argument, but we'll consider it. All right. Thank you for your argument. Sir, I appreciate it. Judge, thank you. Thank you, sir. Mr. Conboy, we'll hear from you. Mr. Howard, Your Honors, it's good seeing you all again. I'll address some of the issues that were raised by Mr. Howard. First of all, as it relates to the sufficiency of evidence. As we noted in our brief, we indicted Mr. Reese on the investigation that was done that did not include his post-arrest interview. So we didn't even have his post-arrest interview until after we arrested him on the warrant for the indictment. I bring that up because based on just the physical evidence, including the phones that were reviewed for the text messages and the corroboration to those messages, such as the videos at the apartment that showed Reese's vehicle or the statements from the scene of the overdose, as it relates to the messages, it created a very narrow timeline. To answer your question, Your Honor, the initial call, well, yeah, the initial call for the overdose occurred at 4.32 p.m. Paris Hunt sent a cash app payment to Michael Reese at 3.05 p.m. and then the last message from Paris Hunt to Reese, which Reese said, I'm on my way, occurred at 2.52 p.m. So it's just around an hour and a half or about that time frame. Was the evidence that she had just taken a Percocet, isn't that what her statement was to law enforcement? She said Percocet. That was her words. He took a half pill of Percocet. And so the law enforcement... Wait a minute, wait a minute. She said he took a half pill, meaning... Her son. The son, okay. So she specified that he took the pill. She was very clear about it. Because law enforcement was invested, you know, when they come in, she's trying to do CPR. The officer testified she wasn't doing it right. She was freaking out. She's screaming, crying. He gets her out of the way. He jumps in, starts CPR, and he's trying to ask her, what's wrong, what's going on? And she says, he took a half pill. She goes to look for it, comes back, says it's not there. So right away, everybody's assuming he took this half pill of Percocet based on what she said. I thought she said, I took a half, and maybe he took the half. Is that, isn't that what... I put the half up. I think she was saying she put the half a pill... Up, and then maybe... On the lid, is just as specific as what she said. And then she couldn't find it. Correct. And so law enforcement only knew this part of the investigation. And it's such a tight time frame. And it is, if you're connecting the dots, it's very clear. He reaches out to the drug dealer. He goes to meet her, the other pill distributor that he was getting his pills from. He makes arrangements with her. He goes out, meets her. He has a vehicle that he borrowed from somebody else that's seen on the video at Paris Hunt's apartment. And then we have the messages between Reese and Paris Hunt. Very tight time frame. That alone would have been enough to show that there was definitely a connection between the overdose and Reese's involvement. The second part, after he gets arrested, he gives a very clear... It's a horrible interview. And it's one of the worst things I've ever heard in my life. Somebody that callously talked about this stuff, but he makes it very clear that, you know, he's shoulder puts the responsibility on her. But he makes it very clear. He brought over a pill. He told her to put it up. I talked about the lid. He said, you have the lid. And even the overdose itself, he says it had to have happened. You want to talk about, well, how did, you know, this poor child overdose, you know, is it because this pill? Even he can follow the evidence and say that's what had to have happened. So... Is that what he said? Yeah. That's had to have been what happened? Yes, Your Honor. He was blaming the mother, you mean, for not... No, that the victim took the pill that he left over. I know that. I thought your point was that he was following, he was making that inference, but blaming the mother for not putting the pill away. No, you are correct, Judge. He was blaming the mother. Sorry, I couldn't hear very well. No, he continually shifted blame to other people, not just the overdose case, but as well as the human trafficking case. He continually minimized his involvement. So as it relates to the casual connection between the two, I think it's very clear. What's the evidence that the Percocet included fentanyl? There was a couple of different things. One, when they first interviewed Mr. Reese, he kept saying, I don't use them. I had overdosed myself. I wasn't giving her 30s, which everybody knows to be the M30s, which are the fake OxyContin pills. I don't think he ever says Percocet himself. He's just talking about pills. He gave her a pill. Later on in the interview, I don't even know if he realizes he's doing it, but he starts calling them 30s again. So he admits that they're 30s, which through, there's plenty of Rule 16 testimony from the investigators that the 30s are otherwise known as the fake OxyContin pills containing fentanyl. And then once they get the lid that the mother admitted that the pill was in, and even Reese acknowledges they tested that, and that had the fentanyl residue on it. So I don't think there's any doubt in the world that that pill that he gave to the mother contained fentanyl. A couple other issues that were raised. One, the vulnerable, the victim enhancement. Again, listen to the interviews. It's hard to describe. I mean, it's creepy. It's predatory. This is a guy who admits that he's seeking vulnerable people. He uses the word vulnerable. And he says, I look for these vulnerable people. I slip in. He has sexual interactions with them. He knows they're homeless. And if they're homeless, they need rides. They need money to eat. He wants them to call him daddy. So they can rely on him. Was there more than one? How many victims were there? He spoke in perhaps plurals, but we only have one victim for this particular charge, right? One particular charge involving an underage individual, correct. I think there was, I don't believe there was any evidence in front of the jury because that could have been unnecessarily prejudicial. I know that there was evidence that he abused other women to keep them quiet. I think that that might've been some evidence, or at least it was raised at sentencing. But just one charge on this one particular person is what it was limited to. But I think there was, if you're asking me outside of the evidence, I do believe that there was- PSR. Did the PSR have other victims or not? It references, I think, at least two other potential. I think it just alludes to it, says there was two other individuals that were probably in the same circumstances, but it doesn't reference whether or not they were juveniles, but then mentions his physicality with those individuals. I think that's why it was relevant. So this is somebody that specifically goes out and finds vulnerable people. And like I said, he's the one that uses the word vulnerable. And this victim, her particular factors, including her being homeless, not having money to eat, she's, these are things that she told him. He knew very well these characteristics. In fact, she's literally begging him for money to eat. And his response to her is slow feet, don't eat. She's not out being pimped enough to make money, so no, she doesn't deserve to eat. And that's, I mean, to say that he, this wasn't vulnerable enough to be, to receive this vulnerability enhancement, I don't know what it would be then. I mean, this is somebody that, I said, it's just, it was not a good interview to listen to. As it relates to some of these other issues, and I'm running out of time. What about the sentencing, the joint sentencing? I was gonna ask, would the government have objected to separate sentencings? And I realize that's a hypothetical. You don't really know what your position might have been at the time. But in your experience, would that have been at least a possibility for the district court to have two separate sentencings? So that you could take into account the certain offense characteristics and acceptance of responsibility separately? Chronologically, Judge, this is what happened. The defendant pledged the sex trafficking, human trafficking charge. We then went to trial on the overdose. So the human trafficking charge got set for sentencing first. Following the trial on the overdose, the court, at least I believe addressed it, and just at the end of the trial said, we'll move the sentencing for the other case so that back a little bit further so it can be set together. I don't remember if it was a question of whether or not we objected or not objected to it. But do you think that's something though that could have been done? That, have you seen that happen before in a similar situation where one, certainly the parties could take different positions on whether a joint sentencing hearing would be appropriate or not, but have you seen that happen before? I have not seen that before, and I don't believe that the court would have separated the sentencing. I think the court just moved them together on its own. We didn't really weigh in one way or the other. And I don't know if the court, since it was doing it on its own, would have entertained separating them due to judicial resources. Judge, I'm gonna run out of time here unless anybody has any specific questions. Very well, thank you for your argument. Thank you both. It's good seeing you again. Yes, sir, thank you for being here. Thank you to both counsel. The case is submitted. The cases are submitted, and the court will file a decision in due course. That concludes the argument session for this morning. The court will be in recess until nine o'clock tomorrow. Thank you. I'm gonna be in here for a few minutes. I'm gonna grab this little tissue. Tissue. Do you want to take these? Can you take these? I got these. Do you want to take these ones? Yeah. Okay. Thank you. Yeah, I don't know if Michelle's done yet. Oh, I just said we're done. Oh, yeah, we're done here.